NATIONAL PLUMBING SUPPLY COMPANY, A CORPORATION, PLAINTIFF, V. CAESAR TORRETTI, DOING BUSINESS AS THE SOUTHWEST HEATING COMPANY, ET AL., DEFENDANTS. ALCO INVESTMENT COMPANY, A CORPORATION, ET AL., RESPONDENTS, CARR-TROMBLEY MANUFACTURING COMPANY, A CORPORATION, APPELLANT.—175 S. W. (2d) 947.

St. Louis Court of Appeals. Opinion filed December 7, 1943.

Respondents' motion for a rehearing denied December 28, 1943.

*Harry S. Gleick* for appellant.

576

*Joseph Boxerman* and *Wm. H. Allen* for respondents.

ANDERSON, J.—This is an equitable mechanic's lien action, instituted by the National Plumbing Supply Company, in which the appellant, the Carr-Trombley Manufacturing Company, was made a defendant. As a lienor, the Carr-Trombley Manufacturing Company filed its cross-petition, in which it sought to establish a lien for materials it had furnished, and which materials had gone into the construction of buildings owned by the defendant Alco Investment Company. The appeal in this case is from a judgment against appellant on the issues raised by appellant's cross-petition and by the answers filed thereto.

The respondents are Alco Investment Company, a corporation, owner of the property upon which the lien was sought to be established; Vincent A. Chinberg, Marie Chinberg, and Albert Ellicock, as members of the last Board of Directors of the Alco Investment Company, all of whom were made parties defendant after the corporate charter of that company had been forfeited; Vincent A. Chinberg, individually; and Christian Stocke, Rudolph A. Buermann, and William J. Abbott, Jr., parties named in various deeds of trust upon the property in question.

Appellant's cross-petition alleged that defendant Alco Investment Company was the owner of two contiguous lots in St. Louis County, Missouri; alleged that appellant, at the special instance and request of said company, delivered to said premises certain described material of the reasonable value of $1883.27, which went into the construction of two buildings which said owner, on April 30, 1931, began to erect on said lots; and further alleged that no part of said amount had been paid.

The alleged lien account, as set out in said petition, shows the items furnished and the dates of delivery. The last delivery date, although shown in the petition to have been made on January 15, 1932, actually, as shown by a stipulation between the parties, was made on September 28, 1931.

The cross-petition further alleged that the mechanic's lien account, as set out in said cross-petition, was filed in the office of the Circuit Clerk of St. Louis County on March 28, 1932, six months after the furnishing of the last item that went into the construction of the buildings.

The deeds of trust were described as building loans; and priority of appellant's lien over them was claimed.

Respondents, in their answers, admitted that defendant Alco Investment Company was the owner of the lots and improvements known as and numbered 7732 and 7736 Delmar boulevard in St. Louis County, Missouri, being the property described in appellant's cross-

petition; and also admitted that on April 30, 1931, the Alco Investment Company began the erection of two brick buildings on said lots, which were contiguous.

They then alleged several defenses, including a general denial under which the issue decisive of the case was tried; that is, whether appellant was an original contractor with the owner, and hence entitled to six months in which to file its lien, or whether appellant was a subcontractor under the Swan. Supply Company, as claimed by respondents, with only four months in which to file its lien.

The evidence showed that the Alco Investment Company was a Missouri corporation, organized, in 1915, by Vincent A. Chinberg, to take title to real estate owned by him. He was its president and general manager, and owned all of its stock except two qualifying shares. The Swan Supply Company, likewise was a Missouri corporation organized and financed by defendant Chinberg. It was incorporated about 1925. Chinberg was also its president and general manager, and owned all of its stock except two qualifying shares.

For many years prior to the events which gave rise to this suit, Chinberg had been a speculative builder, buying from appellant building material for a great many buildings which he constructed. All purchases made before 1927 were made by him personally, and his accounts were carried on appellant's books in his individual name, although the titles to the real estate upon which the buildings were erected were in the name of the Alco Investment Company. At the trial Chinberg testified that the latter company was a one-man corporation, and that he included its operation in his personal income tax returns.

However, after 1927, and after the incorporation of the Swan Supply Company, a different method was pursued in the purchasing of materials needed for the construction of buildings upon Chinberg's land, title to which was in the name of the Alco Investment Company. After that date, materials were supplied upon orders of the Swan Supply Company; dray tickets, invoices, and statements were made out in the name of the Swan Supply Company; and, the accounts for materials furnished were entered in appellant's books in the name of the Swan Supply Company.

Edward G. Krumpleman, appellant's credit man, testified at the trial that about 1927 Chinberg told him he was forming a purchasing company to take care of the buildings they were erecting, because by using the name of the supply company he could buy materials wholesale, which he could not do as an individual. Krumpleman further testified that Chinberg asked him to bill materials in the name of the Swan Supply Company; that Chinberg stated, when he first started buying in the name of the Swan Supply Company, that Swan would buy the materials, and Alco would pay for them. He also testified that Swan Supply Company bought the materials and built the

buildings; that between 1927 and 1932 appellant had some fifty or sixty jobs in the name of the Swan Supply Company; that in about ninety per cent of the cases the jobs were paid for with Alco checks; that the Carr-Trombley Manufacturing Company never at any time charged materials on its books to Alco Investment Company; that requests for payments of amounts due on this and other jobs were made to Swan Supply Company as evidenced by Defendants' Exhibit E, which was as follows:

St. Louis, Dec. 30, 1931

Swan Sup. Co.
808 Chestnut St.
St. Louis, Missouri.
Gentlemen:

We are giving you below list of jobs, amounts and due dates:

| 7454 Wellington | $1,004.24 | Jan. 5th |
| 7732-36 Delmar | 1,880.77 | Jan. 17th |
| 5521 January | 83.78 | Jan. 18th |

We are giving you this information at this time, so you can have your check ready for us on these jobs on the above dates.

Expecting your co-operation in this, we remain,

Very truly yours,
Carr-Trombley Mfg. Co.
by J. D. Adams
Sec'y & Mgr.

Defendants' Exhibit G, a letter of the Carr-Trombley Manufacturing Company, dated January 25, 1933, and addressed to V. A. Chinberg, was also introduced in evidence. It began:

Dear Sir:

As requested by you we are listing below the amounts still due us on the various jobs we furnished for the Swan Supply Co. which we believe you will find correct.

The letter then contains a list of nineteen items for materials furnished on various construction jobs in the city and county of St. Louis, including the balance stated to be due on the jobs at 7732 and 7736 Delmar boulevard.

Defendants' Exhibit H consisted of thirty-three cancelled checks, drawn on the Twelfth Street National Bank, and issued by the Swan Supply Company on various dates between January 6, 1930, and October 2, 1931, totaling $20,709.34, all of which were signed by the Swan Supply Company by Vincent A. Chinberg or by A. V. Lindee, and all of which have an endorsement on the back reading, "Carr-. Trombley Manufacturing Company."

The Swan Supply Company, for carrying on its operations, employed about four hundred men. It erected buildings for the Alco Investment Company and for others. Its principal office was at 808 Chestnut street in the City of St. Louis, which also was the office

of the Alco Investment Company. At this office both corporations had the same employees, the same officers, and the same directors. The Swan Supply Company also maintained an office and warehouse at Taylor and Swan avenues in St. Louis. During the entire time it operated, it did not pay a dividend.

From the testimony in the case, it also appears that the Swan Supply Company made a practice of charging the Alco Investment Company on its books with all money for materials and labor paid out by the Swan Supply Company on any of its building projects. This method was followed on the job involved in this case.

The Swan Supply Company paid the rent for the Chestnut street office; and defendant Chinberg's name appeared on the window of this office, but there was no sign to indicate that it was the office of the Alco Investment Company or of the Swan Supply Company.

No specific contract was entered into between appellant and Swan Supply Company on any individual job with respect to the furnishing of materials, but shortly after January of each year appellant would send to the Swan Supply Company a price list, and from this list the Swan Supply Company would send in orders for materials needed. In January, 1931, appellant's representative and Chinberg made an agreement with reference to prices for materials to be furnished during the year, and Chinberg requested that deliveries for the two Delmar buildings be made as one job.

These two buildings were built upon contiguous lots in St. Louis County, and were known as 7732 and 7736 Delmar boulevard. The lots were owned by the Alco Investment Company, and the buildings erected thereon, which were two-family flats, were started in the spring of 1931. The first item of material was furnished by appellant on May 18, 1931, and the last item that actually went into the buildings was furnished on September 28, 1931. The usual method that had been followed since 1927 was employed. The materials were furnished upon orders of the Swan Supply Company. The dray tickets, twenty-seven in number, and the invoices were made in name of the Swan Supply Company, and the account was charged on appellant's books to the Swan Supply Company. The reasonable value of the materials furnished, which went into the buildings, was $1880.77. Nothing was paid on this account, and on March 28, 1932 appellant filed its lien statement.

The Anderson-Stocke-Buermann Realty Company financed the building operations on these lots by making building loans to the Alco Investment Company, the owner, of $9500.00 on each of the two lots, secured by deeds of trust. Nearly all of the proceeds of these loans were paid out by the realty company on the order of the owner, Alco Investment Company, by realty company checks, drawn from time to time as the building operations progressed. The checks were issued by the realty company to the Swan Supply Company, except

in a few instances, where the checks were made payable to persons who had furnished labor or materials, or both, to the Swan Supply Company. Of the loan on 7732 Delmar boulevard, all was paid to Swan Supply Company, or its subcontractors, except a balance of $384.42, which was paid to the owner, Alco Investment Company; and, of the loan on 7736 Delmar boulevard, all was paid out to Swan Supply Company or its subcontractors, except a balance of $406.42, which was paid to the owner, Alco Investment Company.

Mr. Pegram of the realty company testified that in making a building loan, it is customary for the proceeds of the loan to be paid to the contractor or subcontractors, on orders of the owner, and if there is any balance remaining, it goes to the owner of the property. He also testified that he knew of his own knowledge that the Swan Supply Company, as builder and contractor, erected and built buildings for people other than the Alco Investment Company.

The trial court, in its finding and decree, found that appellant's contract was with the Swan Supply Company, and not with the Alco Investment Company, and that, therefore, the Carr-Trombley Manufacturing Company was a subcontractor and not a general contractor. The court further found that appellant had not filed its lien within four months as required of subcontractors, and accordingly adjudged that appellant was not entitled to recover. After an unavailing motion for new trial, the Carr-Trombley Manufacturing Company brought this appeal.

The appellant advanced the theory that the Swan Supply Company was an agent for the Alco Investment Company, and, therefore, its acts in purchasing materials from appellant were in law the acts of the Alco Investment Company. This conclusion, and the argument in support of it, are based upon the effect ascribed to the manner of the incorporation of the Swan Supply Company, and the methods employed by it and by the Alco Investment Company in carrying on the business. If this argument and conclusion are sound, then the trial court erred in holding that the lien was not filed in time, for if the Swan Supply Company was an agent instead of an independent contractor, appellant should be regarded as an original contractor with the owner within the purview of section 3546, Revised Statutes Missouri 1939 (Mo. R. S. A., sec. 3546); and, under the provisions of section 3551, Revised Statutes Missouri 1939 (Mo. R. S. A., sec. 3551), appellant was entitled to six months within which to file its lien. [Hearne v. Chillicothe & R. Co., 53 Mo. 324; Darlington Lumber Co. v. James T. Smith Bldg. Co., 134 Mo. App. 316, 114 S. W. 77.]

It cannot be disputed that a corporation, as well as a natural person, may act as agent for another, and whether such relationship exists in any particular case may be proved by circumstances, such as the relation of the parties and their conduct with reference to the particular subject-matter dealt with. It is also permissible to prove a

previous course of dealing between the parties. [2 Am. Jur. "Agency," sec. 443, page 351.]

Applying this method of approach to the problem in hand, we have reached the conclusion that there existed between the Alco Investment Company and the Swan Supply Company the relation of principal and agent, rather than that of owner and independent contractor.

In the first place, it is clear from the evidence that the Swan Supply Company was never organized to carry on a business separate and distinct from that of Chinberg and the Alco Investment Company. The very purpose of the creation of the Swan Supply Company was for the Swan Supply Company to act as an instrument to assist Chinberg and the Alco Investment Company in carrying on their business as speculative builders. Chinberg testified to this when he said he organized the Swan Supply Company because by using the corporate form he could get better wholesale prices, as far as purchasing building supplies was concerned, than he could as an individual. He owned all the stock of the Swan Supply Company except two qualifying shares. This, likewise, was true with reference to the Alco Investment Company. The officers and directors of both corporations were the same. The two companies occupied the same office. Chinberg was president and general manager of both. The Swan Supply Company declared no dividends. When it paid out money for materials, it was immediately reimbursed by the Alco Investment Company, but in many instances materials purchased by the Swan Supply Company were paid for directly by the Alco Investment Company. No attempt was made to show that on the particular job here involved, or on any job for that matter, the Swan Supply Company and the Alco Investment Company entered into any construction contract whereby the Swan Supply Company undertook to do the particular work, and receive compensation by way of profit, commission, or otherwise. In addition, from the record it appears that Chinberg, at about the time he organized the Swan Supply Company, and when he requested appellant to carry the accounts for materials purchased in the name of the Swan Supply Company, told appellant's' credit man that the Alco Investment Company would pay for same, and that the Swan Supply Company was just a trade name; that the Swan Supply Company was organized simply because by buying through it he could buy at wholesale. All these facts and circumstances lead to but one inference, namely, that the Swan Supply Company in purchasing material from appellant herein was acting as agent for the Alco Investment Company, and not as an independent contractor. [See Winslow Bros. Co. v. McCully Stone Mason Co., 169 Mo. 236, 69 S. W. 304; Stark Electric R. Co. v. McGinty Contracting Co., C. C. A. 6, 238 Fed. 657.]

A great portion of respondents' brief is devoted to the presentation of authorities which announce well-recognized principles of law, but which have no application to the facts in the case at bar.

Respondents urge that courts will not disregard the legal fiction of corporate entity, except where the corporate structure is created as a mere subterfuge or a cloak for the purpose of perpetrating a fraud or for promoting injustice. This is substantially a correct general statement of the law. [See Wormser, "Piercing the Veil of Corporate Entity," 1912, Columbia Law Review, XII, 496; Canfield, "The Scope and Limits of the Corporate Entity Theory," 1917, Columbia Law Review, XVII, 128.] But, in the case at bar appellant does not charge fraud, nor does it ask that corporate entities be ignored. It simply asks that its case be decided upon the well-known principles of agency.

Respondents also say that because the account was entered on appellant's books in the name of the Swan Supply Company, credit was therefore extended to the Swan Supply Company alone, and, therefore, appellant cannot hold the principal even though it received the benefit of the credit. We do not believe the record will sustain this position.

Edward G. Krumpleman testified that Chinberg told him to charge the materials on their books to the Swan Supply Company; that his company had been doing business with Mr. Chinberg for about nine years; and, that up until 1927 materials purchased had been charged on their books to Chinberg personally, but that after 1927 the account was changed into the name of the Swan Supply Company. He further testified:

"Q. When you made the change in 1927 did you have any conversation with Mr. Chinberg about it? A. Yes, I did.

"Q. What did he tell you to do? A. Well, he said he was forming a purchasing company to take care of the buildings they were building, and by using the supply company name he could buy materials wholesale from some houses he couldn't buy from individually, and he just adopted that style.

"Q. What did he tell you in reference to the manner in which you should bill for the materials, if he told you anything? A. He asked us to bill it in the name of Swan Supply Company.

"Q. Had you been doing that for the four years prior to 1931? A. We did.

The Witness: When he first started buying in the name of Swan he paid for them on the Alco Investment Company, and I asked him what that was for and he said, "Those two companies are me." I said, "Why don't you charge this to the Alco Investment Company?" and he said, "No, I want to buy these materials through Swan Supply Company."

"The Court: Q. What else? A. They bought the materials and Alco would pay for them.

"Q. What did he say about the construction of the buildings? A. He said Swan was building the buildings and buying the materials and he was handling them in that name.

"Q. Did he ever tell you whether Swan was a separate corporation, or not? A. No, he did not.

"The Witness: He asked us to use the name of Swan Supply Company as a trade style, and he said he was using it to purchase materials.

"Q. Mr. Krumpelman, did you on any jobs, did the Carr-Trombley Company on any jobs receive checks from the Alco Investment Company in payment for work done, rather, for materials delivered to property owned by the Alco Investment Company where you had billed as in this case, to the Swan Supply Company? A. I would say about 90 per cent.

"Q. Who were the other 10 per cent? A. Checks on orders, also Anderson-Stocke-Buermann paid me on a few orders, and we had a few Swan checks.

"The witness further testified that in 1927 when he first noticed orders coming through in the name of the Swan Supply Company, he had a conversation with Chinberg at the latter's office. At that time he had with him an Alco Investment Company check, and asked Chinberg about it. He further testified: "When he gave me the check I asked him, 'What has the Alco Investment Company got to do with the Swan Supply Company?' . . . He told me the Swan Supply Company was acting as an agent for Alco Investment Company and there was no change, it was still him, except the styles of the names."

The rule which respondent contends should apply in this case rests upon the assumption that credit was extended to the agent alone. Here the credit was not given the agent, but the principal used the name of the agent, not to avoid its own liability, but simply to enable it to obtain an advantage with respect to making purchases with some materialmen with whom it dealt. Chinberg informed appellant of this purpose, and requested that the account be carried in the name of the Swan Supply Company, leading appellant to believe that it was a mere matter of form, and that as between them the arrangement was that the materials were really for the Alco Investment Company, and that that company would pay for such materials as would be furnished. We fail to find an election on the part of appellant to extend credit exclusively to the Swan Supply Company.

As a further objection to the enforcement of this lien, respondents claim that the material was not furnished by appellant under one general contract so as to authorize the filing of one lien. The statute, Section 3579, Revised Statutes Missouri 1939 (R. S. A., sec. 3579), provides as follows:

"When the improvement consists of two or more buildings, united together and situated upon the same lot or contiguous lots, or separate buildings upon contiguous lots, . . . and erected under one general contract, it shall not be necessary to file a separate lien upon each building or lot for the work done or materials furnished in the erection of such improvements."

In construing this section of the statute, the court in Deardorff v. Roy, 50 Mo. App. 70, loc. cit. 74, said:

"The words, 'erected under one general contract,' are not to be confined to a case where the owner may contract for the completion of the buildings in one general contract. In such case the contractor could, of course, have one lien against all the buildings. So, too, could anyone, furnishing material to such contractor for all the buildings, have his lien against all, notwithstanding the material so furnished may only partly contribute to the erection of the buildings. And so, too, those words will include a case like the one at bar, where the entire building is not let to a contractor, but where the lienor furnishes to the owner, for all the buildings, material which goes into such erection, notwithstanding such material may compose only a part of such erections."

The evidence in this case shows that shortly after January, 1931, Krumpleman, representing the appellant, and Chinberg agreed upon a price list for the building materials which Chinberg would use in any and all buildings that he would erect during that year. The evidence also shows that Chinberg told Krumpleman to make the deliveries for the two buildings as one job. Chinberg testified that this "was a contract that was supposed to cover all the work." All deliveries, thereafter, were made as needed and in accordance with this agreement as to prices.

From this evidence, it is clear that the agreement which was made by appellant's offer of materials at certain prices and Chinberg's acceptance of the offer by ordering materials for the two houses as one job, was a general contract, and not a special contract confined to any single or definite building. It, therefore, was a general contract within the meaning of section 3579, Revised Statutes Missouri, 1939 (Mo. R. S. A., sec. 3579). [Bulger v. Robertson, 50 Mo. App. 499.]

Appellant also assigns as error certain rulings of the trial court with respect to the admission and exclusion of evidence. We find it unnecessary to pass upon these assignments.

Appellant is entitled to its lien against the property in question, superior to the deeds of trust mentioned in its cross-petition; is en-

titled to a general judgment for $1880.77, with interest thereon from March 28, 1932; and is entitled to its costs; all against Vincent A. Chinberg; Marie Chinberg, and Albert Ellicock, as members of the last Board of Directors of the Alco Investment Company.

The judgment, therefore, is reversed and the cause remanded to the trial court, with directions to enter a judgment in accordance with the views herein expressed. *Hughes, P. J.*, and *McCullin, J.*, concur.